NOT DESIGNATED FOR PUBLICATION

No. 127,864

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

DANIEL E. BREASHERS,
*Appellant*.

MEMORANDUM OPINION

Appeal from Shawnee District Court; BRETT A. WATSON, judge. Submitted without oral argument. Opinion filed July 31, 2026. Affirmed.

*Sean P. Randall*, of Kansas Appellate Defender Office, for appellant.

*Michael R. Serra*, deputy district attorney, *Michael F. Kagay*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before SCHROEDER, P.J., GARDNER and CLINE, JJ.

PER CURIAM: A jury convicted Daniel E. Breashers of rape, aggravated battery, and lewd and lascivious behavior. Before us, Breashers timely challenges only his rape conviction and sentence, arguing the State committed prosecutorial error in its opening statement and closing argument and the district court erred by failing to sua sponte order a mental health evaluation before sentencing. Breashers also claims the district court erred in assessing BIDS attorney fees against him in the amount of $8,625. After an extensive and thorough review of the record, we find no error and affirm.

1

Breashers was charged with one misdemeanor count of lewd and lascivious behavior for acts committed in March 2021, and one felony count each of rape, aggravated burglary, and aggravated battery for acts committed in October 2022. At the conclusion of the jury trial, the jury found Breashers guilty of all charges except aggravated burglary. Breashers was sentenced to a term of 618 months' imprisonment for rape with lifetime postrelease supervision; a concurrent term of 13 months' imprisonment for aggravated battery; and a consecutive term of 6 months in the county jail for lewd and lascivious behavior. The district court also ordered Breashers to pay $8,625 in BIDS attorney fees. Given the limited issues on appeal, we have chosen not to set out the details of Breashers' acts with the victim. Additional facts are set forth as necessary.

ANALYSIS

*The prosecutor did not commit error in his opening statement or closing argument.*

Breashers argues he was denied the right to a fair trial on the rape conviction because the prosecutor misstated the evidence in his opening statement and closing argument about what DNA evidence would be shown to the jury. Breashers now seeks the reversal of his rape conviction and remand for a new trial.

We review a prosecutor's comments made during voir dire, opening statement, or closing argument even if the defendant failed to contemporaneously object. *State v. Sean*, 306 Kan. 963, 974, 399 P.3d 168 (2017). We use a two-step process—looking at error and prejudice—to evaluate claims of prosecutorial error:

"To determine whether prosecutorial error has occurred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial." *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016).

Prosecutors are afforded a wide latitude in formulating their arguments to prosecute the State's case, but they cannot misstate the law or argue factual inferences without evidentiary foundation. *State v. Patterson*, 311 Kan. 59, 70, 455 P.3d 792 (2020).

Breashers contends the State committed prosecutorial error in opening statement by claiming it would introduce statistical DNA data that was never introduced during the trial. Breashers contends such error was highly prejudicial and affected the outcome of his trial. "'Opening statements are given to assist the jury in understanding what each side expects the evidence will prove and to frame the questions the jury will have to decide'; a prosecutor errs when straying outside the evidence they expect to be able to prove." *State v. Timley*, 311 Kan. 944, 950, 469 P.3d 54 (2020).

In his opening statement, the prosecutor stated:

"Ultimately you will hear from [the DNA expert] and she will tell you that as to the vaginal swabs that, and she'll explain what a DNA haplotype is, but it's based on the male chromosome, the DNA passed down by the male lineage, that the haplotype that was inside of [the victim's] vagina was observed zero times in a database of 13,228 haplotypes.

"But more important is that Daniel Breashers, and all [his] male paternal relatives, could not be excluded as a possible contributor to that DNA. Meaning, he was a possible contributor of that DNA. And she will give you the statistical analysis as I indicated."

Breashers suggests the prosecutor's statements were erroneous because the DNA expert never testified that Breashers' DNA was compared to any known samples in a database, including known samples of over 13,000 other men. And the DNA expert never discussed statistics about "how rare/common it would be for two random men to share a DNA haplotype that was consistent with the one obtained from [the victim's] vagina."

The DNA expert explained to the jury that "DNA is found in most cells of a person. . . . [It] could be left behind by touching an item. It could be in saliva, it could be from wearing clothing, your skin cells would transfer to that item, potentially." The expert explained how DNA samples are obtained and extracted and testified she prepared a screening report and DNA report based on items law enforcement submitted for biological testing in this case. Both reports were entered into evidence without objection. Breashers did not include the admitted reports in the record on appeal, and the State later moved to add the reports to the record on appeal. The DNA report stated, with respect to the victim's vaginal swab:

> "[T]he partial major male DNA haplotype has been observed 0 times in the database of 13,228 haplotypes. Using the 95% upper confidence interval, the estimated probability of selecting an unrelated male at random from the general population with the partial major male DNA haplotype is approximately 1 in every 4,416 individuals."

The DNA expert further explained she had two known DNA samples—a known sample from the victim and a known sample from Breashers. The expert testified she tested the victim's vaginal swab, and the swab showed male DNA was present but the swab had excessive amounts of female DNA and the testing instrument could not obtain a male profile. The DNA expert then performed male DNA haplotype testing—testing specific to male DNA—which showed a partial major DNA haplotype consistent with Breashers' DNA. Haplotype DNA is not unique to each individual but is passed through male lineage, meaning the haplotype DNA found on the victim's vaginal swab was

4

consistent with Breashers' DNA or a male relative of Breashers. The victim's external genitalia, face, and neck swabs also contained a partial male DNA haplotype consistent with the known male haplotype of Breashers.

While the State did not elicit testimony on direct examination from the DNA expert as to the statistical DNA data, the expert did give a detailed overview of how the testing was done. More importantly, the DNA information Breashers complains was not introduced as evidence was, in fact, provided to the jury in the expert's DNA report, which Breashers did not object to. The State's opening statement did not stray outside the evidence it expected to prove and clearly falls within the wide latitude afforded prosecutors in conducting the State's case. See *Timley*, 311 Kan. at 950; *Patterson*, 311 Kan. at 70. Thus, Breashers cannot demonstrate prosecutorial error.

Nevertheless, even if the statements Breashers complains of were erroneous, his claim would fail under the prejudice prong of the analysis. In addressing prejudice:

> "[W]e apply the constitutional harmlessness standard laid out in *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967), which demands the State show beyond a reasonable doubt that the prosecutorial error did not affect the trial's outcome in light of the entire record. In other words, the question is whether there is no reasonable possibility that the error contributed to the [decision]." *State v. Flack*, 318 Kan. 79, 111, 541 P.3d 717 (2024).

There was overwhelming evidence that, even without the DNA statistics, Breashers committed the acts complained of. In addition to the victim's testimony about the incident, Topeka police detective, Grant Mink, also testified he was helping other officers execute a search warrant to collect DNA evidence from Breashers' body. Breashers did not want to submit to a penile swab and "basically said that since he was there at the law enforcement center[,] he didn't need to do [the swab] because he did it."

5

Mink's interaction with Breashers to collect DNA evidence was recorded, and Breashers made the following voluntary statements:

- "If I'm here, of course I did do it, right?"
- "So, if this is a sexual assault case, and if you got me, then that must mean that I'm the one that did it, right?"
- "All of this is unnecessary, if I did it, I did it."
- "But I'm telling you I did do it so there's no reason [to collect evidence]."

The record reflects that the prosecutor did not misstate the evidence in his opening statement. Even if the prosecutor's remarks were error, such error was harmless in light of all of the evidence presented at the trial—including Breashers' admissions—and did not violate Breashers' right to a fair trial.

Breashers next claims the prosecutor's remarks in his opening statement were amplified in closing argument. "[A] prosecutor has the latitude during closing argument to highlight the evidence presented and to draw reasonable inferences from that evidence." *State v. Brown*, 316 Kan. 154, 164, 513 P.3d 1207 (2022).

In closing argument, the State proffered: "[W]hose DNA they got? The defendant's. Whose DNA is in [the victim's] vagina? The defendant's." In rebuttal, the State reminded the jury:

"[O]ne of the instructions you have, but also that we talked about in voir dire is, is that statements of me, statements of defense counsel, is not evidence. Questions, in of themselves, are not evidence. Only the answers, only the testimony given from that stand, only the exhibits. All those exhibits, all that testimony, says only one thing. That was not consensual."

6

Again, Breashers voluntarily made several incriminating statements to law enforcement that were published to the jury. The jury also had the DNA reports with the following findings:

- With respect to the victim's vaginal swabs, "[t]he partial major male DNA haplotype is consistent with the known male DNA haplotype of Daniel Breashers. Therefore, Daniel Breashers and all his male paternal relatives cannot be excluded as possible contributors to the partial major male DNA haplotype."

- "Using the 95% upper confidence interval, the estimated probability of selecting an unrelated male at random from the general population with the partial major male DNA haplotype is approximately 1 in every 4,416 individuals."

- With respect to the victim's external genitalia swabs, "[t]he partial male DNA haplotype is consistent with the known male DNA haplotype of Daniel Breashers. Therefore, Daniel Breashers and all his male paternal relatives cannot be excluded as possible contributors to the partial male DNA haplotype."

- "Using the 95% upper confidence interval, the estimated probability of selecting an unrelated male at random from the general population with the partial male DNA haplotype is approximately 1 in every 4,416 individuals."

While the prosecutor may have incorrectly referred to the test results as DNA and not DNA haplotype on the victim's body or in her vagina, the statement was harmless and did not affect the outcome of Breashers' trial in light of the entire record. See *Flack*, 318 Kan. at 111. Breashers' claims of prosecutorial error in opening statement and closing argument fail.

*We decline to review Breashers' claim the district court should have sua sponte ordered Breashers to undergo a mental health evaluation.*

Breashers submits he exhibited a clear need for psychiatric care and treatment, and the district court abused its discretion in failing to sua sponte order a mental health evaluation before sentencing. Breashers asks us to vacate his sentence and remand to the district court with directions to order an evaluation under K.S.A. 22-3429 and consider the findings of the evaluation in sentencing him. Breashers explains he is not arguing he should have received a particular sentence; instead, had the district court ordered an evaluation, it would have potentially imposed a more individualized sentence.

Breashers failed to request an evaluation under K.S.A. 22-3429 before the district court and did not object to the lack of such evaluation. Breashers claims we can review the issue for the first time on appeal because it involves the denial of fundamental rights—an exception to the preservation requirement. See *State v. Hilyard*, 316 Kan. 326, 343, 515 P.3d 267 (2022). However, we are not obligated to consider an issue that was not raised before the district court, especially one that entails factual determination. *State v. Rhoiney*, 314 Kan. 497, 500, 501 P.3d 368 (2021). Thus, we exercise our discretionary and prudential authority not to review this unpreserved claim.

*The BIDS attorney fee assessment was reasonable.*

Breashers' last claim on appeal is the district court abused its discretion in ordering him to pay $8,625 in BIDS attorney fees by failing to ask about his financial situation or the burden paying the fees would place on him. Breashers requests that we vacate the order imposing attorney fees and remand to the district court to determine a more reasonable amount that would not create a manifest hardship.

8

"We review the amount of [BIDS] attorney fees imposed for an abuse of discretion." *State v. Buck-Schrag*, 312 Kan. 540, 555, 477 P.3d 1013 (2020). But Breashers claims the district court erred in failing to satisfy the statutory requirements under K.S.A. 22-4513(b). Statutory interpretation is a question of law subject to unlimited review. *State v. Robinson*, 281 Kan. 538, 539, 132 P.3d 934 (2006).

After conviction, a defendant must pay "all expenditures made by the state board of indigents' defense services to provide counsel and other defense services to such defendant . . . ." K.S.A. 22-4513(a). The district court is to consider the defendant's financial resources and the nature of the financial burden in determining the amount owed and method of payment. The district court may waive all or part of the payment due, or modify the method of payment, if it determines such payment will impose a "manifest hardship" on the defendant or his or her family. K.S.A. 22-4513(b).

Although Breashers failed to raise this issue before the district court, our Supreme Court considered a similar issue for the first time on appeal in *Robinson*. There, our Supreme Court explained BIDS fees classify as "recoupment" and are not punitive in nature. 281 Kan. at 543. The court noted the language in K.S.A. 22-4513(b) is mandatory and requires a sentencing judge to consider the defendant's financial resources at the time reimbursement of BIDS fees is ordered as well as financial burdens the payment will impose. *Robinson*, 281 Kan. at 543. The sentencing court must "*explicitly* [state] on the record how those factors have been weighed in the court's decision." 281 Kan. at 546.

In *Buck-Schrag*, the district court ordered the defendant to pay $7,000 in attorney fees, rather than the $9,500 the State requested, finding he was "'able-bodied'" and believed he would "'be employable and employed and given a job within the prison system.'" 312 Kan. at 555. The district court determined a yearly payment of $243 per year ($20.25 per month) was reasonable, and "'even the higher amount suggested by the State is an amount that is reasonable recognizing resources, recognizing burden.'" 312

9

Kan. at 555. Our Supreme Court affirmed the district court, finding it "considered the financial burden attorney fees would place on Buck-Schrag." 312 Kan. at 556.

Here, the district court asked Breashers about his financial circumstances, but Breashers would not respond and would not make eye contact with the district judge. The district court explained:

> "Now regarding the issue of costs and fees. The defendant provides no information regarding his ability to pay these costs and fees. However, I would note that the defendant is in his mid-20's. He appears to be young and physically capable of working. Therefore, for court costs I'm going to impose $193, that includes a $22 surcharge. I will impose a KBI DNA data base fee of $200. If that has been paid in another case that will abate to zero. I will impose a KBI laboratory fee of $400. I will impose a BIDS application fee of $100 and BIDS attorneys fees in the amount of $8,625.

> "This—the total amount of costs and fees in this case will come to $9,518, which is certainly a substantial amount. But for the next 618 months the defendant will have no financial responsibilities regarding his housing, food or medical care. And if paid at a rate of $15.40 per month, the defendant would be able to satisfy the entire amount while he is in prison. I therefore find costs and fees will not impose an undue hardship upon the defendant. Keeping in mind that there are opportunities to earn money and to work while a person is in custody with the department of corrections."

While the district court did not specifically ask about Breashers' wages, other expenses he was responsible for, or the resources he had available to pay the fees during incarceration, it detailed the length of his sentence, the lack of financial responsibilities and living expenses inherent with being incarcerated, and the fact he was young and physically capable of working. The district court in *Buck-Schrag* made a similar finding and provided a similar explanation. In fact, in *Buck-Shrag*, the district court imposed a higher monthly payment than the district court here ordered Breashers to pay. The district court considered Breashers' financial resources and the nature of the financial burden in

determining Breashers' repayment of $8,625 over the course of 618 months—over 51 years—for a monthly payment of $15.40, including other fees owed. We also observe, in the event Breashers receives "good time credits" to reduce the length of his sentence, that reduction in time would not greatly increase the amount he needs to pay per month. The district court made an explicit finding on the record that the payment plan would not create an undue hardship and did not abuse its discretion.

Affirmed.